**\*NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| DISTRICT 1199P HEALTH AND WELFARE PLAN, individually and on behalf of all others similarly situated, | : : : : | Civil Action No. 06-3044 (FLW) |
| Plaintiff, | : : | |
| v. | : : | |
| JANSSEN, L.P., et al., | : : | |
| Defendants. | : : | |

| | | |
|---|---|---|
| IRONWORKERS LOCAL NO. 399 AND PARTICIPATING EMPLOYERS HEALTH AND WELFARE FUNDS, on behalf of itself and all others similarly situated, | : : : : : | Civil Action No. 07-2224 (FLW) |
| Plaintiff, | : : | |
| v. | : : | |
| JANSSEN, L.P., et al., | : : | |
| Defendants. | : : | |

| | | |
|---|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 98, on behalf of itself and all others similarly situated, | : : : | Civil Action No. 07-2608 (JAP) |
| Plaintiff, | : : | |
| v. | : : | |
| JANSSEN, L.P., et al., | : : | |
| Defendants. | : : | |

|  |  |  |
|---|---|---|
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, on behalf of itself and all others similarly situated, | : : : : | Civil Action No. 07-2860 (GEB) |
| Plaintiff, | : : | **OPINION** |
| v. | : : | |
| JANSSEN, L.P., et al., | : : | |
| Defendants. | : : | |

**WOLFSON, United States District Judge:**

      Presently before the Court is a motion by defendants, Janssen, L.P. and Johnson & Johnson (collectively, "Defendants"), to dismiss Counts I-III of the Consolidated Amended Class Action Complaint ("Complaint"), pursuant to Fed. R. Civ. P. 12(b)(6). This putative class action involves Defendants' alleged off-label sale and marketing of the prescription drug, Risperdal®, which is approved for the treatment of schizophrenia, bipolar mania, and autistic disorder. Plaintiffs, District 1199P Health and Welfare Plan, Ironworkers Local Union No. 399 and Participating Employers Health and Welfare Funds, International Brotherhood of Electrical Workers Local 98, and Southeastern Pennsylvania Transportation Authority (collectively, "Plaintiffs"), are third-party payors that allegedly paid for Risperdal® on behalf of their beneficiaries, insured, or employees. Plaintiffs, individually and on behalf of all others similarly situated, in Counts I-III, allege that Defendants by engaging in improper off-label promotion of Risperdal® violated: (1) the RICO Act, 18 U.S.C. § 1961, et seq.; (2) RICO conspiracy, 18 U.S.C. § 1962(d), by conspiring to violate 18 U.S.C. § 1962(c); and (3) the New Jersey RICO

Act, N.J.S.A. 2C:41-1 et seq., ("NJRICO").[1]  Defendants deny any improper marketing, but even

if true, contend that Plaintiffs have failed to adequately plead RICO violations.  For the reasons

that follow, the Court grants Defendants' Motion to Dismiss Counts I-III of Plaintiffs'

Complaint.


**I. Background and Procedural History**

Since Defendants move to dismiss Plaintiffs' RICO claims pursuant to Fed. R. Civ. P.

12(b)(6), the following version of events assumes Plaintiffs' allegations to be true.  The Court

will only recount facts that are relevant for the purposes of deciding this Motion.

In their Complaint, filed on February 29, 2008, Plaintiffs allege, inter alia,[2] that

Defendants perpetrated a carefully orchestrated scheme to illegally market and promote,

resperidone, sold under the brand name Risperdal® ("Risperdal"), for "off-label" uses, meaning

uses not approved by the Food and Drug Administration ("FDA") and the safety and efficacy of

the drug for these uses have not been established.  Compl. ¶¶ 2, 5.

---

[1]Plaintiffs also claim that Defendants' alleged off-label promotion of Risperdal was tortious and violated the consumer protection laws of nearly every state in the country in Counts IV-X.  These claims are not at issue in this motion.

[2] In this class action lawsuit, four separate complaints were filed and then consolidated into this action, including District 1199P Health and Welfare Plan, Civil Action No. 06-3044; Ironworkers Local Union No. 399 and Participating Employers Health and Welfare Funds, Civil Action No. 07-2224; International Brotherhood of Electrical Workers Local 98, Civil Action No. 07-2608; and Southeastern Pennsylvania Transportation Authority, Civil Action No. 07-2860.

District 1199P is a jointly trusteed employee benefit trust fund and an employee welfare benefit plan providing benefits for approximately 2,600 participants.  Compl. ¶ 13.  Ironworkers Local Union No. 399 is a health and welfare fund.  Id. ¶ 14.  IBEW Local 98 is an employee welfare benefit plan and employee benefit plan that pays for medical benefits and prescription drugs for approximately 3,000 participants.  Id. ¶ 15.  SEPTA employs a work force of approximately 9,000 people and provides medical benefits for eligible employees.  Id. ¶ 16.

Risperdal is now sold and marketed by Ortho-McNeil-Janssen Pharmaceuticals, Inc., formerly known as Janssen Pharmaceutia Inc., the general partner of Janssen, L.P. and a wholly-owned subsidiary of Johnson & Johnson.  Id. ¶ 17; see Df. Mot. at 1.  Johnson & Johnson is one of the world's largest manufacturers of health care products for consumer and pharmaceutical markets.  Compl. ¶ 18.  Risperdal is a second generation atypical antipsychotic prescription medication that is FDA approved for: (1) long-term treatment of acute manic or mixed episodes of bipolar I disorder in adults; (2) monotherapy for the short-term treatment of acute manic or mixed episodes of bipolar I disorder in adults; (3) a combination therapy, with Lithium or Valproate, for the short-term treatment of acute manic or mixed episodes associated with bipolar I disorder in adults; (4) the treatment of irritability associated with autistic disorder in children and adolescents (between the ages of 5 and 16); (5) the treatment of schizophrenia in adolescents ages 13-17 years; and (6) the short-term treatment of bipolar I disorder in children and adolescents ages 10-17 years. Id. ¶ 4.

Plaintiffs allege that Defendants, fully aware of the federal laws that prohibit "off-label" marketing and promotion of pharmaceuticals, nonetheless illegally marketed and promoted Risperal for unapproved or "off-label" uses, including uses in children and adolescents as well as in the elderly population.  Id. ¶ 5.  Congress and the FDA have promulgated laws designed to regulate two of the most prevalent indirect promotional strategies: (1) manufacturer dissemination of medical and scientific publications concerning the off-label uses of their products, and (2) manufacturer support for Continuing Medical Education ("CME") programs that advocate off-label uses of their drugs.  Id. ¶ 31.  Plaintiffs allege that Defendants illegally conspired to aggressively market Risperdal through a nationwide, uniform marketing campaign to

"misrepresent[] the comparative safety, efficacy and superiority of Risperdal over other traditional/typical or atypical antipsychotics to the health care community, consumers, third-party payors, and others, with the common goal to increase sales of Risperdal and the Defendants' profits," which has led to approximately 66% of Risperdal sales stemming from off-label uses.  Id. ¶¶ 6, 55.

Plaintiffs claim that Defendants "overstat[ed] the drug's uses, while understating (if not outright concealing) Risperdal's side effects and even life threatening medical conditions" in a deliberate and calculated campaign designed to increase the sales of the drug by misleading physicians to write off-label prescriptions of Risperdal.  Id. ¶¶ 50, 68, 71.  Despite Defendants' alleged promotion of Risperdal's "superior safety and effectiveness," Plaintiffs assert that Risperdal and other atypical antipsychotics are "neither more effective nor safer than older, less expensive, typical antipyschotics."  Id. ¶¶ 51, 67.  Targets of Defendants' alleged scheme were health assistance programs; children who suffer from insomnia, attention deficit disorder or display behavior problems; elderly who experience Alzheimer's disease and dementia; and patients who experience depressive or mood disorders; and patients who experience the symptoms of generalized anxiety disorder, post traumatic stress disorder and substance abuse.  Id. ¶¶ 74.  Defendants allegedly committed numerous predicate acts of racketeering, specifically, multiple instances of bribery, in violation of state statutes; mail fraud, in violation of 18 U.S.C. § 1341; and wire fraud, in violation of 18 U.S.C. § 1343, including acts of sending illegal marketing, advertising, sale, and promotional material relating to Risperdal.  Id. ¶¶ 9, 212.[3]

---

[3]Plaintiffs allege in conclusory fashion that Defendants engaged in an ongoing, open-ended pattern of racketeering using interstate mail and wire communications.  Id. ¶¶ 160, 211-218.

Defendants allegedly created and used a "Marketing Firms Enterprise" ("the enterprise"), comprised of Defendants and "seemingly-independent research organizations and marketing and public relations firms," who all shared "the common goals of illegally marketing, advertising, promoting and selling Risperdal in order to increase profits by increasing the off-label use of Risperdal," and acted as the "vehicle or tool to effectuate the Defendants' pattern of racketeering activity." Id. ¶¶ 10, 207-08. Defendants' alleged illegal scheme consisted of a campaign combining their own significant personnel and financial resources with a discreet and identifiable number of medical marketing firms, peer physicians, public officials, and purported independent charities and social programs to market and promote Risperdal's off-label use. Id. ¶ 73.[4]

Defendants allegedly used the enterprise to organize and direct the publication of articles and statements in studies to promote Risperdal's off-label use. Id. ¶ 97. This enterprise allegedly hosted CMEs, which are typically independently-sponsored educational programs, but it is alleged here, that at these CMEs, physicians, compensated by Defendants, relayed misleading information to encourage other physicians to prescribe Risperdal for off-label uses. Id. ¶¶ 84-96. According to Plaintiffs, Defendants were successful in influencing the off-label promotion because they hand-picked peer-sellers and key physicians as leaders to speak favorably about the drug[5] and

---

[4]Plaintiffs do not identify the number or the names of any of these entities.

[5]For example, Plaintiffs allege "Dr. Charles Nemeroff, the presenter for the 2007 CME presentation entitled Add On Atypical Antipsychotics Efficacious in Short Term for Unipolar Depression, references the ARISE-RD study, which was an attempt to demonstrate the efficacy of Risperdal for depression. . . . Dr. Nemeroff claimed that a peer-reviewed study showed Risperdal improved sexual functioning, when the effects of treatment on sexual functioning were not mentioned in the ARISE-RD study. Additionally, Dr. Nemeroff claimed that the study showed Risperdal demonstrates efficacy over placebo, which the ARISE-RD study in fact did not. . . . Dr. Nemeroff has been a long time key opinion leader for Defendants and has participated in a Janssen-financed journal supplement in 2005." Id. ¶ 96.

induced attendee physicians to listen to their off-label marketing pitch, to prescribe Risperdal for off-label use, and to recommend off-label use of Risperdal to other physicians.  Id. ¶¶ 90-93, 136-37.  In exchange, Defendants allegedly provided financial incentives, including expensive dinners and vacations at "lavish" accommodations, disguised grants, and paid drug trials.  Id. ¶¶ 136-37.

Defendants allegedly omitted or misrepresented information about Risperdal's off-label uses when they marketed it to physicians, inflating the number of prescriptions written and filled and causing Plaintiffs to overpay for the drug.  Id. ¶¶ 12, 146, 160, 182, 187.  Defendants allegedly published only favorable, and suppressed unfavorable, results about the adverse effects of the Rispersal drug, such as, inter alia, increased risk of death, and made false and misleading claims regarding its efficacy, including that it has a low incidence of movement disorders, sedation, and anticholinergic effects (variety of movement disorders).  Id. ¶¶ 108, 121, 133.  Plaintiffs acknowledge that "[p]hysicians are free to prescribe approved drugs for their patients as they see fit to adequately treat any condition or symptom."  Id. ¶ 56.  Plaintiffs claim, however, that Defendants' alleged scheme and deceptive conduct directly and proximately caused economic loss to Plaintiffs because they unnecessarily paid for Risperdal off-label use prescriptions for their members or beneficiaries because of the misinformation disseminated by Defendants, which fraudulently increased the demand and sale of Risperdal and deprived Plaintiffs of cheaper alternatives and/or resulted in inflated prices.  Id. ¶¶ 11-12, 36, 193.

Plaintiffs allege that they were injured by their "economic loss," which is "unaffected by whether any given patient ingested Risperdal or suffered adverse side effects."  Id. ¶ 11.  Plaintiffs assert that they, as third-party payors, had to pay for Risperdal in situations where it was not approved as safe and effective by the FDA, after it had been placed on the formulary for on-label

use by the Pharmacy Benefit Managers ("PBMs").  Id. ¶¶ 189, 191.  For example, according to Plaintiffs, "[p]hysicians have been misled by Defendants' scheme to believe that Risperdal is superior in its effectiveness and safety to other lower-costing and equally effective antipsychotic drugs," and thus, Risperdal's sales increased.  Id. ¶ 67.  Plaintiffs claim that "Dr. Rosenheck reported that Trilafon [is more cost-effective than the newer drugs in terms of their 'human benefit' because it] cost[s] between $300 and $600 less per month, compared to Risperdal.  Trilafon is no less effective and substantially less expensive – by between $3,600 and $7,000 a year."  Id. ¶ 62.  As a result of the foregoing, Plaintiffs allege that they were fraudulently denied comparably safe and effective, cheaper alternatives to Risperdal and overpaid hundreds of millions of dollars for doses of Risperdal that were prescribed by physicians because of Defendants' off-label marketing scheme.  Id. ¶¶ 12, 67, 71, 193.

On March 31, 2008, Defendants filed their motion to dismiss Counts I-III of Plaintiffs' Complaint with prejudice for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6).  Defendants argue that Plaintiffs' RICO and NJRICO claims are substantively flawed because (1) Plaintiffs did not suffer a cognizable RICO injury, (2) Plaintiffs' theory of causation is too attenuated and speculative as the physicians exercised independent medical judgment on an individual patient basis and Plaintiffs did not rely on Defendants' alleged misrepresentations,[6] and (3) Plaintiffs do not sufficiently allege predicate acts, including mail or wire fraud, necessary to adequately plead RICO.  Therefore, Defendants argue, Plaintiffs' RICO conspiracy claim cannot be sustained as a matter of law.  On April 30, 2008, Plaintiffs filed their

---

[6]In Bridge v. Phoenix Bond & Indemnity Co., 128 S.Ct. 2131, 2139 (2008), the Supreme Court recently determined that first-party reliance is not an element in civil RICO claims.  See Part III.A.2., infra.

opposition asserting that they adequately allege a cognizable injury, that Defendants' conduct proximately caused their injury, and that they sufficiently plead RICO predicate acts and conspiracy to violate RICO.  On May 15, 2008, Defendants filed their reply.  Thereafter, both parties submitted supplemental authority and briefing therewith.  The Court grants Defendants' Motion for the reasons that follow.

This Court has subject matter jurisdiction over this federal RICO action pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.


## II. Standard of Review

When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citation and quotations omitted).  Recently, in Bell Atlantic Corporation v. Twombly, 127 S.Ct. 1955 (2007), the Supreme Court clarified the 12(b)(6) standard.  Specifically, the Court "retired" the language contained in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. at 1968 (quoting Conley, 355 U.S. at 45-46).  Instead, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." Id. at 1965.  As the Third Circuit has stated, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up

thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element.  This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element."  Phillips, 515 F.3d at 234 (quoting Twombly, 127 S.Ct. at 1965).

## III.  Discussion

### A.  Plaintiffs' RICO and NJRICO Claims

To properly plead under RICO, a Plaintiff must allege "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity' as well as an injury resulting from the conduct constituting a violation."  Bonavitacola Elec. Contr., Inc. v. Boro Developers, Inc., 87 Fed. Appx. 227, 231 (3d Cir. 2003) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)).  The Act "provides for liability in civil suits brought by any person injured 'in his business or property' by a RICO violation, with a compulsory award of treble damages, costs, and attorneys fees . . . [and] makes it unlawful for 'any person' who is employed by or associated with 'any enterprise' affecting interstate commerce to 'participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'"  Genty v. Resolution Trust Corp., 937 F.2d 899, 906 (3d Cir. 1991) (citing 18 U.S.C. §§ 1962(c), 1964(c)).  The Third Circuit has articulated that Section 1964(c) requires "a RICO plaintiff to make two related but analytically distinct threshold showings . . . : (1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff's injury was proximately caused by the defendant's violation of 18 U.S.C. § 1962."  Maio v. Aetna, Inc., 221 F.3d 472, 483 (3d Cir. 2000).  The Court will address these

standing requirements below.

**1. Injury**

Defendants argue that Plaintiffs did not suffer a cognizable RICO injury because Plaintiffs seek recovery solely for alleged economic loss, which Defendants argue are mere allegations of "overpayment" or "diminished value" for a safe and effective drug that is plainly speculative and not a "concrete financial loss" cognizable under RICO.  Plaintiffs, however, assert that they plead a cognizable injury, past and present, in the form of a financial loss from overpayment, sufficient to confer standing.

The Supreme Court has stated that a plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation [of RICO]."  Sedima, 473 U.S. at 496; see 18 U.S.C. § 1964; Genty, 937 F.2d at 906; see also Cetel v. Cmmw. Life Ins. Co., 460 F.3d 494, 510 (3d Cir. 2006) ("[T]he New Jersey Supreme Court believe[s] the New Jersey RICO statute was and should be consistent with the federal RICO statute."); N.J.S.A. 2C:41-4(c).[7]  While the Supreme Court has generally stated that RICO is to be read broadly, the Third Circuit has held that § 1964(c)'s standing limitation assures that not every plaintiff has a federal cause of action arising under RICO.  See Maio, 221 F.3d at 483 (internal citations and quotations omitted).  "[A] showing of injury requires proof of a concrete financial loss and not mere injury to a valuable intangible property interest."  Id. (internal citations and quotations omitted).

Plaintiffs allege that they suffered economic loss as third-party payors because

_____

[7]As the facts alleged apply to both the RICO and NJRICO claims and the RICO and NJRICO statutes are intended to have the same reach, the Court addresses these claims together under the RICO analysis.

11

Defendants' scheme "depriv[ed them] of cheaper alternatives and/or result[ed] in higher prices for [Risperdal] than otherwise would have existed."  Compl. ¶ 12.  Plaintiffs argue that their Complaint sufficiently alleges a concrete financial loss for amounts they overpaid for Risperdal due to Defendants' illegal or deceptive marketing practice, which inflated the number of prescriptions written and filled and led to higher co-payments and out-of-pocket costs.  Compl. ¶¶ 187, 192-193.  To support their claim of a cognizable injury sufficient to confer standing, Plaintiffs cite to a number of cases, all of which are distinguishable from the instant action.  Cf. Sedima, 473 U.S. at 484, 494 (finding the plaintiff properly pled an injury under RICO when he allegedly paid falsified bills that the defendant created and presented); P&P Mktg., Inc. v. Ditton, 746 F. Supp. 1354, 1358, 1361 (N.D. Ill. 1999) (finding the plaintiff sufficiently pled a RICO injury by alleging he paid overcharges where defendants caused submission of falsified invoices).

      For example, Plaintiffs cite In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 531 (3d Cir. 2004), in which the Third Circuit held that "[third-party payors], like individual consumers, suffered direct economic harm when, as a result of [the pharmaceutical companies'] alleged misrepresentations, they paid supracompetitive prices for [the brand drug] instead of purchasing lower-priced generic [drug]," but no RICO claims were alleged.  Plaintiffs also direct the Court to the Second Circuit's recognition of the right of health benefit providers to recover from drug companies amounts that were overpaid due to illegal or deceptive marketing practices.  Desiano v. Warner-Lambert Co., 326 F.3d 339, 349-50 (2d Cir. 2003).  In In re Warfarin and Desiano, however, the plaintiffs sought relief under federal antitrust laws and consumer fraud claims, which are distinct from the RICO allegations brought here.  Similarly, Plaintiffs cite Blue Cross & Blue Shield United v. Marshfield Clinic of Wis., 65 F.3d 1406, 1414-16 (7th Cir. 1995), another

12

antitrust case in which no RICO claims were alleged, and the plaintiffs allegedly paid supracompetitive charges directly to the monopolist.  Moreover, in a subsequent Seventh Circuit case, the court limited the Marshfield Clinic reasoning and applicability in RICO cases.  Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc., 196 F.3d 818, 826-27 (7th Cir. 1999).

Plaintiffs also direct the Court to In re Zyprexa Prods. Liab. Lit., 493 F. Supp. 2d 571, 576 (E.D.N.Y. 2007), where RICO claims were alleged and survived a motion to dismiss, but which relied on Schwab v. Philip Morris USA, Inc., 449 F. Supp. 2d 992 (E.D.N.Y. 2006), rev'd sub nom. McLaughlin v. American Tobacco Co., 522 F.3d 215, 228 (2d Cir. 2008).  In overturning Schwab, the Second Circuit found that plaintiffs' theories of injury – loss causation – were not cognizable under RICO.  See McLaughlin, 522 F.3d at 228.  The court held that the "loss of value model is designed to award plaintiffs damages based on the benefit of their bargain.  Such damages are generally unavailable in RICO suits . . . [where the statute] compensates only for injury to 'business or property.'" Id. (internal citations omitted).  Moreover, the defendants' misrepresentation "could in no way have reduced the value of the [product] that plaintiffs actually purchased," but rather the defendants "simply could have induced plaintiffs to buy [the product over other products]." Id. at 229.  The Second Circuit determined that this alleged injury did not satisfy the requisite pleading of concrete financial loss for RICO claims.  See Id. at 228-29.  Thus, Plaintiffs' reliance on these cases is misplaced.[8]

--------

[8]In Plaintiffs' causation argument, they also allege that damage models will demonstrate the effect of Defendants' scheme, contending that they have pled a cognizable injury and that Defendants were the cause of the injury.  Pl. Opp. at 17.  In that connection, the Court notes that this is not a viable approach.  Plaintiffs essentially concede that they cannot identify any ascertainable concrete injury, since they assert that Defendants' "arguments [that Plaintiffs lack a

Defendants assert that Plaintiffs' allegations of "overpayment" are insufficient to constitute a RICO injury, where Plaintiffs seek recovery solely for an alleged economic loss, on the theory that alternative medications <u>might have been</u> at least as effective and cheaper than Risperdal.  Defendants argue that Plaintiffs fail to allege that their beneficiaries, insured, or employees received an ineffective medication or that Risperdal physically harmed them, but rather concede that Risperdal was safe and effective.  Thus, according to Defendants, Plaintiffs' purported injury, based on paying too much for a safe and effective medication, is plainly speculative and not a "concrete financial loss" cognizable under RICO.  <u>See Maio</u>, 221 F.3d at 483-84.  Indeed, in <u>Maio</u>, a case on which Defendants rely, the Third Circuit found that the plaintiffs failed to allege the facts necessary to support their assertion that they suffered a cognizable injury to business or property due to the alleged inferiority of the product received as compared to the product the defendants promised to deliver because the plaintiffs did not allege that they suffered any medical injuries, received inadequate or inferior care, or sought but were denied necessary care as a consequence of the defendants' plan.  <u>Id.</u> at 501.

In response, Plaintiffs assert that their injury is "strikingly <u>dissimilar</u>" to those alleged by the plaintiffs in <u>Maio</u> because the property interest at stake in that case was in the nature of a contractual right to receive a certain level (quantity or quality) of health care benefits from the

_____

cognizable injury or that they were the cause] are especially inappropriate at this early stage of the litigation, when the damage models that Plaintiffs will use to demonstrate the effect of Defendants' scheme have yet to be presented, let alone tested."  Pl. Opp. at 17.  Some sort of damage model, yet to be presented, does not substitute for adequately pleading an injury or causation.  See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 929 (3d Cir. 1999) (rejecting the use of "aggregation and statistical modeling" to satisfy burden of pleading causation).  Thus, Plaintiffs' only identified injury is their alleged economic loss from "overpayment."

defendants, rather than a tangible property right.  Pl. Opp. at 7.  Plaintiffs also assert that, in Maio,

the plaintiffs' injury was predicated on the conclusion that the alleged economic value of the

product purchased was reduced because of the possibility that the alleged inferiority of the product

would manifest itself at some point in the future.[9]  Id. at 8.  Although Maio did deal with an health

insurance "product," Plaintiffs' attempt to distinguish themselves is unconvincing, as they assert a

substantially similar "overpayment" argument as that made by the unsuccessful plaintiffs in Maio.

221 F.3d at 487-88, 492-94.

The plaintiffs in Maio argued that their RICO injury was based on each member of the

nationwide class paying too much in premiums for an "inferior" health care product.  Id. at 484.[10]

In Maio, the plaintiffs' RICO injury theory was grounded in the argument that they paid too much

in premiums for a health insurance plan of lesser value, namely the product received was inferior

_____

[9]The Maio court, in analyzing the plaintiffs' claim that "they need not plead and prove
allegations concerning the level of care that they received to establish the fact of damage," which
was their RICO injury to property theory, determined that the plaintiffs did not have standing.
Maio, 221 F.3d at 494.  It was under this analysis that the court found that insofar as the
plaintiffs' argument was predicated "exclusively on the possibility that future events might occur
[and that the quality of care administered may suffer in some undefined way], rather than on the
actual occurrence of those events and their present effect on the value of the health insurance"
received, the plaintiffs' theory of present economic loss was too speculative and was insufficient
to support a cause of action under RICO.  Id. at 494-55.  Thus, in this case, Plaintiffs plead past
and present injury due to the alleged injury of overpaying for the "inferior" product they
purchased.  But similarly, here, Plaintiffs do not identify any present injury to their insured or
beneficiaries.  Maio's analysis of injury based on the economic loss of the product allegedly
marketed and that an inferior product was allegedly received is pertinent.

[10]The Third Circuit noted that if the product "simply was different than that which was
promised to appellants, then there would be no factual basis for an argument that they overpaid,
inasmuch as a 'different' but equally good health insurance package would have an equivalent
economic value."  Id. at 484 n. 11 (emphasis in original).  The court determined that the
defendants' health insurance "could not be characterized as 'worth less' in monetary value unless
it was inferior in some respect" to the product that had been contracted for.  Id.

to the product the defendants promised to deliver.  Id. at 484 n. 11, 486.  There, the plaintiffs categorized their "concrete financial loss" as the "difference in value between the health insurance promised and the [allegedly 'inferior' and less valuable] health insurance actually received."  Id. at 486.  The Circuit Court rejected the plaintiffs' injury theory based on financial losses of overpayment that the plaintiffs purportedly sustained by enrolling in this inferior plan, since the plaintiffs did not plead that the enrolled "individuals were denied medically necessary benefits, received inadequate, inferior or delayed medical treatment, or even worse, suffered personal injuries as a result of [the defendants' conduct]."  Id. at 488.

Similar to Maio, in the instant case, Plaintiffs categorize their "concrete financial loss" as overpaying for Risperdal for off-label uses due to Defendants' allegedly fraudulent and deceptive marketing practices, which inflated the number of prescriptions of Risperdal written and filled and increased Plaintiffs' co-payments and out-of-pocket costs.  Compl. ¶¶ 187, 192-93; Pl. Opp. at 5.  Plaintiffs plead that they overpaid for Risperdal because it was "neither more effective nor safer than older typical antipyschotics."  Compl. ¶ 51.  In addition, Plaintiffs plead that "the efficacy of all [second generation antipyschotics] is similar" and that none of the second generation antipyschotics are superior in efficacy to the cheaper older typical antipyschotics.  Id.  In that regard, Plaintiffs plead that they were injured by their "economic loss," which is "unaffected by whether any given patient ingested Risperdal or suffered adverse side effects."  Id. ¶ 11.  This is substantially similar to the Maio plaintiffs' argument of overpayment; in that, the "difference in value between the [drug] promised and the [allegedly "inferior" and less valuable drug] actually received."  Maio, 221 F.3d at 486.  Yet, according to Third Circuit precedent, Plaintiffs' injury theory based on financial losses of overpayment that Plaintiffs purportedly sustained by paying for

this "inferior" drug is inadequate for sustaining a RICO injury, absent allegations that Defendants'

drug was on some level "inferior and therefore 'worth less' than what [Plaintiffs] paid for it."  Id.

at 488.

Plaintiffs here allege that Defendants "admitted that [they] omitted material information

about Risperdal, minimized potentially fatal risks, and made misleading claims suggesting

superior safety in comparison to other atypical antipsychotics without adequate substantiation."

Compl. ¶ 131.  Further, Plaintiffs allege that treating behavioral disorders in elderly patients with

dementia with atypical (second generation) antipyschotic medications, like Risperdal, is

associated with increased mortality.  Id. ¶ 132.  However, nowhere do Plaintiffs allege that any

beneficiaries, insured, or employees taking Risperdal "received [an] inadequate[ or] inferior

[drug] or even worse, suffered personal injuries as a result of" Defendants' alleged

misrepresentations.   Maio, 221 F.3d at 488.

Furthermore, Plaintiffs do not plead that Risperdal is inferior to competitor drugs, i.e., that

Risperdal is less effective and/or less safe than, or that the side effects of Risperdal are also not

associated with, other comparable drugs.  Plaintiffs assert that "[r]esearch and studies have

illustrated that physicians can prescribe lower-cost and equally effective alternatives to treat the

conditions for which Defendants have promoted the off-label use of Risperdal."  Compl. ¶ 56.

For example, Plaintiffs assert that Trilafon is more cost-effective than the newer drugs, like

Risperdal, in terms of their "human benefit" because it is no less effective and substantially less

expensive, by between $3,600 and $7,000 a year.  Id. ¶ 62.  Applying Maio, however, merely

stating that Risperdal is "equally effective," "no . . . more effective," or "neither more effective

nor safer," all of which imply that it is no less effective or safe, is not a sufficient pleading of

17

inferiority to sustain Plaintiffs' RICO injury.  See 221 F.3d at 488 (finding that without pleading

denial of benefits, inadequate, inferior or delayed treatment, or actual injury, "there is no factual

basis for appellants' conclusory allegation that they have been injured in their 'property' because

the health insurance they actually received was inferior and therefore 'worth less' than what they

paid for it"); Compl. ¶¶ 51, 56, 59.  In addition, where no additional pleading of injury is alleged,

Plaintiffs' allegations that there are more "cost-effective" alternatives do not meet the required

pleading of overpayment as a concrete financial loss.  See Maio, 221 F.3d at 488.

"Inasmuch as there are no allegations in the complaint to the effect that appellants have

received inadequate care, suffered medical injuries, or have been denied medically necessary care,

the fair inference to be drawn from the complaint . . . is that none of those events have occurred."

Maio, 221 F.3d at 500.  Similarly, Plaintiffs allege that Defendants' fraud is their

misrepresentation of the safety and efficacy of Risperdal for off-label uses and that it is worth less

than what they paid for it, without alleging that the drug harmed the beneficiaries in any way or

that the drug lacked safety or efficacy; as such, the Court must infer that the drug did not harm the

beneficiaries.  "Without alleging that a product failed to perform as advertised, a Plaintiff has

received the benefit of his bargain and has no basis to recover purchase costs."  Williams v.

Purdue Pharma Co., 297 F. Supp. 2d 171, 176 (D.D.C. 2003) (citation omitted).  Therefore,

Plaintiffs do not plead a concrete financial loss in the form of overpayment, absent allegations that

the drug was inferior on some level and worth less than what they paid for it.  Because Plaintiffs

fail to sufficiently allege a cognizable RICO injury under federal or New Jersey law, they lack

standing to bring such claims.

## 2. Causation

Defendants argue that Plaintiffs also lack standing to bring Counts I and III of their Complaint because Plaintiffs' theory of causation is too attenuated and speculative.  In their supplemental filing, dated June 11, 2008, Defendants concede that the Supreme Court, in Bridge v. Phoenix Bond & Indemnity Co., 128 S.Ct. 2131 (2008), held that a plaintiff need not plead and prove that it relied on the defendant's alleged misrepresentations.  While Defendants concede that first-party, or here, third-party payor, reliance is no longer an issue,[11] they press their other independent bases for dismissal on causation grounds.  Plaintiffs counter that their Complaint adequately alleges that Defendants' conduct proximately caused their alleged injury.[12]  However, as Plaintiffs fail to adequately plead a cognizable RICO or NJRICO injury, they fail to assert that Defendants' conduct proximately caused their injury.

---

[11]Defendants also note, and this Court agrees, that the Supreme Court, in Bridge, stated that "none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that someone relied on the defendant's misrepresentations."  128 S.Ct. at 2144 (internal citations omitted) (emphasis in original). Therefore, as the Supreme Court said, it will be unlikely that Plaintiffs will be able "to establish even but-for causation if no one relied on the misrepresentation" and "the complete absence of reliance may prevent the plaintiff from establishing proximate cause."  Id.  "Accordingly, it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation."  Id.

[12]Defendants argue that Plaintiffs' "inflated price" theory of causation  is "a quintessential fraud-on-the-market theory" of causation.  Plaintiffs assert they do not allege such a theory.  Pl. Opp. 9 n. 3.  The Court notes, however, that if indeed that is what Plaintiffs are pleading, this theory is not recognized in the RICO context, and thus, not a viable theory here.  See, e.g., McLaughlin, 522 F.3d at 228; Stikes v. Teleline, Inc., 281 F.3d 1350, 1362-63 (11th Cir. 2002), abrogated on other grounds, Bridge v. Phoenix & Indem. Co.,128 S.Ct. 2131 (2008); Summit Props., Inc. v. Hoechst Celanese Corp., 214 F.3d 556, 561 & n. 24 (5th Cir. 2000); In re Rezulin Prods. Liab. Litig., 524 F. Supp. 2d 436, 441 (S.D.N.Y. 2007); Heindel v. Pfizer, Inc., 381 F. Supp. 2d 364, 380 (D.N.J. 2004); Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., 192 N.J. 372, 392 (2007).

Notwithstanding Plaintiffs' failure to properly plead an injury, the Court also has a substantial question as to whether Plaintiffs could ever properly plead proximate causation, as required by Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992), or if the independent and individualized decision-making of physicians prescribing Risperdal breaks any chain of causation between Defendants' alleged misconduct and Plaintiffs' payment for the medication. See, e.g., Mazur v. Merck & Co., Inc., 964 F.2d 1348, 1355 (3d Cir. 1992); Heindel v. Pfizer, Inc., 381 F. Supp. 2d 364, 382 (D.N.J. 2004). In addition, in a recent, substantially similar action, in which the plaintiffs were represented by many of the same counsel as in this case, the court determined that the plaintiff third-party payors' claims were "too remote" to satisfy civil RICO's proximate causation requirement. Ironworkers Local Union No. 68 & Participating Employers Health & Welfare Funds, et al. v. Astrazeneca Pharms. LP, et al., No. 07-5000, 2008 WL 4832659, at *4 (M.D. Fla. Nov. 4, 2008). Nevertheless, because Plaintiffs do not sufficiently allege an injury under federal or New Jersey law, they lack standing to bring RICO and NJRICO claims, and the Court need not address causation more fully.

### 3.  Enterprise

Although Defendants have not briefed the issue or disputed the adequacy of Plaintiffs' allegations regarding enterprise, the Court will briefly address whether Plaintiffs' allegations are sufficient to survive a motion to dismiss. An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A RICO enterprise is "an entity [made up of] a group of persons associated together for the common purpose of engaging in a course of conduct." United States v. Turkette, 452 U.S. 576, 583 (1981). To establish the existence of an

enterprise, a plaintiff must prove that (1) the enterprise is an ongoing organization with some sort of framework or superstructure for making or carrying out decisions; (2) the members of the enterprise function as a continuing unit with established duties; and (3) the enterprise must be separate and apart from the pattern of activity in which it engages.  Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 789-90 (3d Cir. 1984).  However, as the rules of pleading require nothing more at this early juncture than a bare allegation, where a plaintiff identifies the "entities it believed were the enterprises that had been marshalled against it," a plaintiff sufficiently alleges the existence of an enterprise.  Id. at 790.

Plaintiffs allege that Defendants created and used a "Marketing Firms Enterprise," comprised of Defendants and "seemingly-independent research organizations and marketing and public relations firms," as the "vehicle or tool to effectuate the Defendants' pattern of racketeering activity" in its alleged "scheme to market Risperdal for off-label use."  Compl. ¶¶ 10, 207-08. Plaintiffs further allege that this uniform marketing scheme devised by Defendants was designed to mislead physicians and resulted in increased sales of Risperdal, thus depriving Plaintiffs of cheaper alternatives and/or resulting in higher prices for the drug than otherwise would have existed.  Id. ¶ 12.  Plaintiffs allege that Defendants, through the enterprise, hosted CMEs, at which physicians, compensated by Defendants, relayed misleading information to encourage other physicians to prescribe Risperdal for off-label uses.  Id. ¶¶ 84-96, 136-38.  Based on these allegations and Defendants' failure to contest the enterprise component, the Court finds that Plaintiffs have sufficiently alleged that an enterprise existed.

**4. Racketeering Activity**

To allege a RICO violation, a plaintiff must articulate a pattern of racketeering activity,

i.e., predicate acts.[13]  See Bonavitacola Elec. Contr., Inc. v. Boro Developers, Inc., 87 Fed. Appx. 227, 231 (3d Cir. 2003) (citations omitted).  The claim "must include the allegation of at least two (2) racketeering acts."  Zellner v. Monroe County Mun. Waste Mgmt. Auth., No. 07-1976, 2008 U.S. Dist. LEXIS 57769, at *20 (M.D. Pa. July 28, 2008).  When fraud is the predicate act, a plaintiff must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). See Warden v. McLelland, 288 F.3d 105, 114 (3d Cir. 2002).  Specifically, Rule 9(b) states "a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  In Frederico v. Home Depot, 507 F.3d 188 (3d Cir. 2007), the Third Circuit qualified what information must be alleged to satisfy the heightened pleading standard of Rule 9(b):

> Pursuant to Rule 9(b), a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the "precise misconduct with which [it is] charged."  Lum v. Bank of America, 361 F.3d 217, 223-224 (3d Cir. 2004).  To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.  See Id. at 224.

Frederico, 507 F.3d at 200; see also Seville Indus. Mach. Corp., 742 F.2d at 791.

General allegations, such as fraud and theft, will not satisfy the pleading standard as they are "not included as [specifically listed] racketeering activit[ies] pursuant to 18 U.S.C. § 1961(1)." Zellner, 2008 U.S. Dist. LEXIS 57769 at *23.  Instead, Plaintiffs, more specifically, attempt to

---

[13]"To set out a prima facie showing of a civil RICO violation under 18 U.S.C. § 1964(c), a plaintiff must have been injured by 'racketeering activity,' 18 U.S.C. § 1962(c)-(d). 'Racketeering activity' is defined as a violation of certain enumerated statutes - commonly known as 'predicate acts' - in 18 U.S.C. § 1961(1)."  Breslin v. Brainard, 128 Fed. Appx. 237, 240 (3d Cir. 2005); see also Anderson v. Ayling, 396 F.3d 265, 269 (3d Cir. 2005) ("The term 'racketeering activity' is defined in 18 U.S.C. § 1961(1) to include a long list of state and federal crimes, among them the wire fraud alleged here."); see generally 18 U.S.C. §§ 1341, 1343.  The Third Circuit permits federal common law or "garden variety" fraud, including mail and wire fraud.  Tabas v. Tabas, 47 F.3d 1280, 1290 (3d Cir.), cert. denied, 515 U.S. 1118 (1995).

allege that the predicate acts are mail and wire fraud.[14]  "Where acts of mail and wire fraud

constitute the alleged predicate racketeering acts, those acts are subject to the heightened pleading

requirement of Rule 9(b)."  Warden, 288 F.3d at 105 (citing Rolo v. City Investing Co.

Liquidating Trust, 155 F.3d 644, 657-58 (3d Cir.1998)).  The Third Circuit in Annulli v. Panikkar

addressed the differential pleading nature of mail and wire fraud:

> There are two elements of a mail or wire fraud charge: "(a) a scheme to defraud,
> and (2) a mailing or wire in furtherance of that scheme."  Greenberg v. Brewster,
> 816 F. Supp. 1039, 1049 (E.D. Pa. 1993).  Wholly intrastate use of the mails for
> fraud violates the mail fraud statute.  See, e.g., In re Burzynski, 989 F.2d 733, 742
> (5th Cir. 1993).  In contrast, the federal wire fraud statute requires interstate use of
> the wire.  See, e.g., Smith v. Ayres, 845 F.2d 1360, 1366 (5th Cir. 1988) ("As
> several courts have recognized, the statute requires that the wire communication
> cross state lines.").

200 F.3d 189, 200 n. 9 (3d Cir. 1999); see also Zellner, 2008 U.S. Dist. LEXIS 5776 at *22-23

(citing Stanley v. Int'l Bhd. of Elec. Workers, AFL-CIO CLC, 207 Fed. Appx. 185, 189 (3d Cir.

2006)) (internal quotations omitted) ("[T]he wire fraud statute, 18 U.S.C. § 1343, 'criminalizes a

scheme to defraud that is transmitted by wire 'in interstate or foreign commerce'; thus, a

complaint must allege interstate use of the wire for each predicate act.").  Moreover, when

asserting mail fraud allegations, a plaintiff must "identify the purpose of the mailing within the

defendant's fraudulent scheme and specify the fraudulent statement, the time, place, and speaker

and content of the alleged misrepresentations."  Annulli, 200 F.3d at 201 n. 10.  In other words,

the plaintiff's pleading must contain the "who, what, when and where details of the alleged

fraud."  Bonavitacola, 87 Fed. Appx. at 231 (quoting Allen Neurosurgical Assoc., Inc. v. Lehigh

Valley Health Network, No. 99-4653, 2001 WL 41143 (E.D. Pa. Jan. 18, 2001)).

---

[14]Plaintiffs also allege bribery as a predicate act.  See Part III.A.4, infra.

Accordingly, this Court will only consider as predicate racketeering acts those wire frauds which have been alleged to have been transmitted by wire "in interstate or foreign commerce" and those mail frauds that are alleged to have made use of the United States Postal Service.  See Zellner, 2008 U.S. Dist. LEXIS 57769 at *23 ("As these . . . frauds were not properly plead, the Court will not consider them as 'predicate acts.'").  Further, this Court will only consider as predicate racketeering acts those mail and wire frauds alleged with the specificity required by the heightened pleading standard of Rule 9(b).  Upon a liberal construction of Plaintiffs' Complaint, this Court cannot discern a communication that arguably rises to the level of specificity needed to satisfy 9(b)'s heightened pleading requirement.  See Bonavitacola, 87 Fed. Appx. at 231.  It is impossible for this Court to discern the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation" of the communications between Defendants.  See Frederico, 507 F.3d at 200.  Thus, Plaintiffs have failed to plead the level of specificity required by the heightened pleading standard of Rule 9(b).

In the instant case, Plaintiffs respond to Defendants' assertion that Plaintiffs' Complaint lacks particularity as "simply unfounded," citing the seventy pages of their Complaint to show their "ample specificity to meet the pleading requirements."  Pl. Opp. at 17.  Plaintiffs argue that they "have marshaled, even at this pre-discovery phase, abundant substance and specificity."  Id. at 18.  Plaintiffs direct the Court to note, for example, their detailing of "Risperdal's global sales, volume, percentage and total revenue in off-label prescription market segments including the fact that sales of Risperdal and Risperdal Consta accounted for approximately 8% and 6%, respectively, of [Johnson & Johnson's] total revenue for the 2006 fiscal year, and Risperdal was used off-label 66% of the time."  Id.; Compl. ¶ 49.  Yet, even upon a liberal construction of the

24

Complaint, Plaintiffs essentially concede that they "do not indicate the date, time, or place of any misrepresentations" nor do they otherwise inject precision or some measure of substantiation into a fraud allegation to discern a communication that arguably rises to the level of specificity needed to satisfy 9(b)'s heightened pleading requirement. Lum, 361 F.3d at 224; see Bonavitacola, 87 Fed. Appx. at 231.

In their Opposition, Plaintiffs argue that the Court should apply the Third Circuit's more relaxed standard for pleadings under Rule 9(b) in the case of corporate fraud. See Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284-85 (3d Cir. 1992) ("Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs. Thus, courts have relaxed the (particularity) rule when factual information is peculiarly within the defendant's knowledge or control.") (citing Craftmatic Sec. Lit. v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989)). In Shapiro, the Third Circuit reiterated "at the very least plaintiffs must allege that the necessary information lies within defendants' control." Id. (internal citations and quotations omitted). In reviewing the district court's dismissal of the plaintiffs' allegations for failure to allege the defendants had exclusive control over the information required to satisfy particularity, the Circuit Court noted that the complaint did not specifically allege that the defendants had exclusive control of the information the plaintiffs needed, but rather "allege[d] only that defendants had access – but not exclusive access – to company information when the alleged misrepresentations and omissions occurred." Id. at 285 n. 13. Further, the Third Circuit found that even if the complaint contained boilerplate allegations that the necessary information was within the defendant's exclusive control, Rule 9(b) would still not be satisfied. See Id. at 285. Rather, under this more relaxed application of the rule, "plaintiffs must accompany such an

allegation with a statement of facts upon which their allegation is based." Id. (internal citations omitted).  More specifically, "a complaint must delineate at least the nature and the scope of plaintiffs' effort to obtain, before filing the complaint, the information needed to plead with particularity." Id.

Plaintiffs assert that they have sufficiently plead with particularity because "the internal corporate mechanisms and activities engaged in by the Defendants in furtherance of their fraudulent scheme are within the exclusive knowledge and understanding of Defendants," citing to Craftsmatic and Shapiro, among others.  Pl. Opp. at 17-18.  Plaintiffs, however, do not make these allegations in their Complaint.  As Plaintiffs do not even allege an insufficient boilerplate allegation that the information they require is within the Defendants' control, they certainly fail to meet even the more relaxed application of the Rule that they argue applies.  This application still requires Plaintiffs' allegations to include at least the nature and the scope of Plaintiffs' effort to obtain, before filing the complaint, the information needed to plead with particularity.  See Shapiro, 964 F.2d at 285.  Thus, even if the more relaxed standard of Rule 9(b) were applicable, which it is not, Plaintiffs fail to meet the pleading of particularity required for mail and wire fraud as predicate RICO acts.

Plaintiffs also appear to allege bribery as a predicate act.  Compl. ¶¶ 9, 212.  Even though Defendants do not raise the sufficiency of Plaintiffs' pleading with respect to this specific predicate act, Defendants have argued an overall failure to plead the alleged predicate acts with particularity, and the Court finds that Plaintiffs have not sufficiently alleged that Defendants engaged in bribery as a predicate RICO act.  While bribery does not invoke the heightened pleading requirements of Rule 9(b), Plaintiffs must satisfy the more liberal pleading requirements

of Rule 8(a) to adequately plead bribery as a predicate act, and they do not.  Plaintiffs make no effort to delineate the elements of bribery nor do they cite to any statute which does so, and thus, Plaintiffs have failed to put Defendants on notice as to what laws they are alleged to have violated.  See generally Lockheed Martin Corp. v. Boeing Co., 357 F. Supp. 2d 1350, 1374-75 (M.D. Fla. 2005).

"A 'pattern of racketeering activity means' at least two predicate acts that 'are related and that amount to or pose a threat of continued criminal activity.'"  Bonavitacola, 87 Fed. Appx. at 231 (quoting H. J., Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989)).  Plaintiffs fail to sufficiently allege even one predicate act as required by RICO, as discussed herein.  Accordingly, Plaintiffs have not sufficiently plead their RICO claims under federal or New Jersey law, and the Court grants Defendants' motion to dismiss Counts I and III of Plaintiffs' Complaint pursuant to Rule 12(b)(6).

### B.  Plaintiffs' Allegation of Defendants' Conspiracy to Commit RICO

In Count II of their Complaint, Plaintiffs allege that Defendants conspired to violate RICO, 18 U.S.C. § 1962(d).  As preliminary matter, Defendants argue that Plaintiffs' RICO conspiracy theory is substantively deficient because it is based on the alleged conspiracy between and among Defendants and their corporate agents.  Df. Mot. at 19.  More specifically, Defendants argue that Janssen and Johnson & Johnson are subsidiary and parent, respectively, and a corporation is incapable of conspiring with itself, its corporate officers, its subsidiaries or its agents.  See Id.  In response, Plaintiffs claim that the Third Circuit has recognized a claim for intra-corporate conspiracies under RICO in Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1164, 1166-67 (3d Cir. 1989), abrogated on other grounds, Beck v. Prupis, 529 U.S. 494 (2000).

Neither the Supreme Court nor the Third Circuit has expressly decided whether RICO, § 1964(d), permits claims of intra-corporate conspiracy, or whether a corporation may conspire with its wholly owned subsidiaries.  Federal courts within this Circuit disagree about whether the Third Circuit, in Shearin, held that a corporation could conspire with its wholly owned subsidiaries under § 1962(d) to violate § 1962(c) of RICO.[15]  Compare Curley v. Cumberland Farms Dairy, Inc., 728 F. Supp. 1123, 1135 (D.N.J. 1990) (finding that, in Shearin, the Third Circuit "concluded that a corporation could conspire with its wholly owned subsidiaries under § 1962(d)"),[16] with Albert Einstein Med. Ctr. v. Physicians Clinical Servs., Ltd., No. 90-3387,

---

[15]Defendants argue that even if Shearin could be read as permitting a finding that a corporation and its subsidiaries may conspire under RICO, it would only be actionable if "the relationship between the parent corporation and its subsidiaries were established solely for the purpose of committing fraud."  Def. Reply at 13 (citing Glessner v. Kenny, 952 F.2d 702, 714 (3d Cir. 1991), overruled on other grounds by Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258 (3d Cir. 1995)).  This, however, was not the finding in Glessner or Shearin.  First, Shearin did permit a RICO conspiracy where the facts disclosed an intra-corporate relationship, nonetheless, Shearin did not address whether a corporation could conspire with its wholly owned subsidiaries under § 1962(d) to violate § 1962(c) of RICO.  See 885 F.2d at 1166-67. Second, in Glessner, the Third Circuit merely reiterated that RICO conspiracy claims must allege an "agreement to commit predicate acts and knowledge that the acts were part of a pattern of racketeering activity."  952 F.2d at 714.  The court then pointed out that, since the plaintiffs in Shearin pled that the relationship between the parent corporation and its subsidiaries was established solely for the purpose of committing fraud, the plaintiffs adequately pled the required inference that the defendant companies allegedly agreed to commit predicate acts and knew that they were part of a pattern of racketeering activity.  Glessner, 952 F.2d at 714.  Glessner did not hold that this fraudulent creation of a subsidiary is a necessary requirement for pleading RICO conspiracy, as Defendants appear to assert, but rather Glessner used the Shearin facts to distinguish Shearin from the case before the court and to explain why the plaintiffs in Glessner failed to provide a similar reasonable inference of adequately pleading RICO in their complaint. Id.

[16]In Curley, the District Court stated that Third Circuit's ruling in Shearin on "intra-corporate conspiracies is more faithful to the broad remedial purpose of RICO than a narrow reading which is model[ed] on antitrust law."  Curley, 728 F. Supp. 1123, 1135 (D.N.J. 1990) (citing Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984)).  The Curley court also stated that "while antitrust law seeks to encourage inter-corporate competition even at a cost

1991 WL 280274, at *5-6 (E.D. Pa. Dec. 20, 1991) (stating that Shearin did not address the issue of whether a corporation and its subsidiaries may conspire to commit a violation of § 1962(d) of RICO, finding that Curley misinterpreted the Third Circuit's holding in Shearin, and determining that Third Circuit precedent does not allow corporations who were innocent victims of a conspiracy among employees to be exposed to RICO liability).  This Court finds that Shearin did not address the issue of whether a corporation and its subsidiaries may conspire to commit a violation of § 1962(d) of RICO and that it remains an open issue in this Circuit.

Other federal circuit courts also disagree about whether RICO permits intra-corporate conspiracies.  See Fogie v. THORN Americas, Inc., 190 F.3d 889, 898 (8th Cir. 1999);[17] Webster v. Omnitrition International, Inc., 79 F.3d 776, 787 (9th Cir.), cert. denied, 519 U.S. 865 (1996);[18]

---

to intra-corporate competition, RICO seeks to eliminate all racketeering activity, both inter-corporate and intra-corporate."  Id. (citing Continental T.V. Inc. v. GTE Sylvania, Inc., 433 U.S. 36 (1977)).

[17]The Eighth Circuit determined where the plaintiffs alleged that the only participants in the conspiracy were the parent corporation and its wholly owned subsidiaries, the plaintiffs "fail[ed] to allege a conspiracy, because as a matter of law a parent corporation and its wholly owned subsidiaries are legally incapable of forming a conspiracy with one another."  Fogie v. Thorn Americas, Inc., 190 F.3d 889, 898 (8th Cir. 1999).  Applying Copperweld's principle that "[i]n any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit," 467 U.S. at 769, the Fogie court found that the identical conclusion was required when it is applied to alleged parent-subsidiary RICO civil conspiracies.  Fogie, 190 F.3d at 898.  In Fogie, the court stated that an alleged conspiracy between a parent and a subsidiary lacks this crucial element because these entities "have a complete unity of interest."  Id.  The Eighth Circuit criticized the Seventh and Ninth Circuits for failing "to explain why, when two entities are under common control and there is no distinctiveness or independence of action, an agreement or understanding between them creates any of the special dangers § 1962(d) targets."  Id.

[18] The Ninth Circuit, relying on the Seventh Circuit's decision in Ashland Oil, Inc. v. Arnett, 875 F.2d 1271 (7th Cir. 1989), extended § 1962(d) liability to a wholly intra-corporate conspiracy.  See Webster v. Omnitrition International, Inc., 79 F.3d 776, 787 (9th Cir.), cert. denied, 519 U.S. 865 (1996).

Ashland Oil, Inc. v. Arnett, 875 F.2d 1271, 1281 (7th Cir. 1989).[19]  Since the law in this area of

RICO is unsettled, district courts have looked to antitrust cases for guidance.  See, e.g., In re

National Mortgage Equity Corp. Mortgage Pool Cert. Sec. Litig., 636 F. Supp. 1138, 1156 (C.D.

Cal. 1986).  The Supreme Court has clearly held that under the Sherman Act, 15 U.S.C. § 1, a

parent company and its wholly owned subsidiary are incapable of conspiring with each other.  See

Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 776-77 (1984).  In Copperweld, the

Court determined that "[a] parent and its wholly owned subsidiary have a complete unity of

interest.  Their objectives are common, not disparate; their general corporate actions are guided or

determined not by two separate corporate consciousnesses, but one."  Id. at 771.  As the parent

and subsidiary always have a "unity of purpose or a common design," Id., the Court held that

parent corporation and its wholly owned subsidiary are incapable of conspiring with each other for

purposes of § 1 of the Sherman Act.  Id. at 777.

---

[19]The Seventh Circuit distinguished the Supreme Court's holding that a parent corporation could not conspire with its wholly-owned subsidiary for purposes of § 1 of the Sherman Act, as a barrier for relief in RICO claims "because the Sherman Act is premised, as RICO is not, on the 'basic distinction between concerted and independent action.'"  Haroco, Inc. v. American Nat. Bank and Trust Co. of Chicago, 747 F.2d 384, 403 n. 22 (7th Cir. 1984) (citing Copperweld, 104 S.Ct. at 2740-44), cert. granted, 469 U.S. 1157, 105 S. Ct. 902, 83 L. Ed. 2d 917 (1985), aff'd on other grounds, 473 U.S. 606, 105 S. Ct. 3291, 87 L. Ed. 2d 437 (1985). Further, in Haroco, the court stated that "[t]he policy considerations discussed in Copperweld[] therefore do not apply to RICO, which is targeted primarily at the profits from patterns of racketeering activity."  Id.  The Seventh Circuit determined that the Sherman Act's theoretical "community of interest" that causes a parent and subsidiary to pose "no threat to the goals of antitrust law-protecting competition" differs from RICO conspiracies because "intracorporate conspiracies do threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers and separating racketeers from their profits."  Ashland Oil, Inc. v. Arnett, 875 F.2d 1271, 1281 (7th Cir. 1989) (citing Russello v. United States, 464 U.S. 16, 26-28 (1983)).  The Eighth Circuit criticized the Seventh Circuit's findings because its "recent decisions regarding intracorporate liability under § 1962(c) . . . appear to undercut the conclusions it reached in Ashland Oil."  Fogie, 190 F.3d at 897 n. 4 (noting that "[m]ore recently . . . the Seventh Circuit has indicated that related business entities may not serve as both the person and enterprise).

The majority of courts within this Circuit agree that a corporation cannot conspire with its agents and/or employees under § 1962(d) of RICO.  See, e.g., Castle v. Crouse, No. 03-5252, 2004 WL 257389, at *6 (E.D. Pa. Feb. 11, 2004) (concluding that a corporate entity cannot conspire with its employees); Hughes v. Technology Licensing Consultants, Inc., 815 F. Supp. 847, 851 (W.D. Pa. 1992) ("The majority rule is that conspiracy cannot lie against the corporate entity for the concerted action of its employees who violate RICO on its behalf."); Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington, 633 F. Supp. 386, 405 n. 23 (D. Del. 1986) (finding parents and subsidiaries "can conspire in violation of RICO no more than they [can] for antitrust purposes").  Contra Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., No. 95-1698, 1996 WL 135336, *5 (E.D. Pa. Mar. 19, 1996) ("a RICO conspiracy can exist between a corporation and its agents or employees"); Curley, 728 F. Supp. at 1135 (recognizing intra-corporate conspiracies under RICO).  An alleged intra-corporate conspiracy comprised solely of a corporation acting in concert with its officers and employees should not be considered as involving separate actors conspiring under the law.  See Emcore Corp. v. PricewaterhouseCoopers LLP, 102 F. Supp. 2d 237, 266 (D.N.J. 2000).  The decision that a RICO conspiracy claim cannot stand where a corporation is alleged essentially to have done nothing more than act in concert with its officers and employees, stems from the premise that "[a] corporation, legally conceived, is only one person" under RICO.  See Id.  These courts generally agree that an exception to the rule against intra-corporate conspiracies exists where the employees act in pursuit of their own interests and not for the benefit of the corporation.  See Castle, 2004 WL 257389, at *6 (internal citations omitted).  Thus, only where the plaintiff alleges something more than a corporation acting in concert with its officers and employees, can a RICO conspiracy claim proceed.

31

The inquiry of whether a parent corporation is capable of conspiring with its wholly owned subsidiary for purposes of violating § 1962(d) of RICO is similar to that of whether a parent can conspire with its subsidiaries under § 1 of the Sherman Act or whether a corporation can conspire with its agents and/or employees under § 1962(d) of RICO.  In all three scenarios, where an intra-corporate conspiracy is alleged, the two conspiring entities are but one.  The parent and its wholly owned subsidiary share a complete unity of interest, with common objectives.  See Copperweld, 467 U.S. at 771.  Similarly, a corporation typically acts in concert with its officers and employees, as one legal person, with similar goals.  See Emcore, 102 F. Supp. 2d at 266.  Thus, a parent corporation cannot conspire with its wholly owned subsidiary to violate § 1962(d) of RICO because the two entities always have a "unity of purpose or a common design."  Copperweld, 467 U.S. at 777.   There is a recognized exception, as pointed out above, in the case where a plaintiff alleges that the employees acted in pursuit of their own interests and not for the benefit of the corporation, or there is an allegation that entities no longer act as one and thus may be considered separate actors under the law.  See Id.; Castle, 2004 WL 257389, at *6.  Therefore, to state a claim under § 1962(d), where a parent corporation has allegedly conspired with its wholly owned subsidiary, there must be some additional allegation, e.g., that the subsidiary was fraudulently created to accomplish the racketeering activity.  See, e.g., Shearin, 885 F.2d at 1166-67.  That has not been done here.  In this case, Plaintiffs allege, albeit inadequately, that Defendants, a parent corporation and its wholly owned subsidiary, conspired with each other and with the other (unnamed) members of the alleged enterprise in violation of § 1962(d).  Compl. ¶ 225-226.  This is not sufficient.

Furthermore, Plaintiffs fail to adequately plead a RICO conspiracy claim, according to the

Third Circuit precedent with requires a claim under § 1962(d) of RICO to include:

> "(1) agreement to commit the predicate acts of fraud, and (2) knowledge that those acts
> were part of a pattern of racketeering activity conducted in such a way as to violate section
> 1962(a), (b), or (c)."  Odesser v. Continental Bank, 676 F. Supp. 1305, 1312
> (E.D.Pa.1987).  "(A)llegations of conspiracy are not measured under the . . .
> [Fed.R.Civ.P.] 9(b) standard, which requires greater particularity of allegation of fraud, but
> are measured under the more liberal . . . (Fed.R.Civ.P. 8(a)) pleading standard." . . .  A
> conspiracy claim must also contain supportive factual allegations.  Black & Yates, Inc. v.
> Mahogany Ass'n, Inc., 129 F.2d 227, 231-32 (3d Cir.), cert. denied, 317 U.S. 672, 63 S.Ct.
> 76, 87 L.Ed. 539 (1942).  The allegations must be sufficient to "describe the general
> composition of the conspiracy, some or all of its broad objectives, and the defendant's
> general role in that conspiracy."  Alfaro, 606 F. Supp. at 1117-18.

Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989).  Plaintiffs fail to set forth the period of this

supposed RICO conspiracy or the actions Defendants allegedly took in support of it.  See Id.

(recognizing "only allegations of conspiracy which are particularized, such as those addressing the

period of the conspiracy, the object of the conspiracy, and certain actions of the alleged

conspirators taken to achieve that purpose" as sufficient).  Plaintiffs also fail show how all of the

alleged conspirators knew that their acts were part of a pattern of racketeering activity.

In any event, Plaintiffs' allegations that Defendants violated § 1962(d) by conspiring to

violate § 1962(c) in this case fail as a matter of law because Plaintiffs have not sufficiently plead a

federal RICO claim under § 1962(c).  See Part III.A, supra.  "Any claim under section 1962(d)

based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the

substantive claims are themselves deficient."  Lum, 361 F.3d at 227 n. 5 (internal citations and

quotations omitted).  Thus, the Court grants also Defendants' motion to dismiss Count II of

Plaintiffs' Complaint, the RICO conspiracy claim.

33

**IV.  Conclusion**

For the foregoing reasons, the Court grants Defendants' Motion to Dismiss Count I-III of Plaintiffs' Complaint.


Dated December 23, 2008                                    /s/ Freda L. Wolfson

                                                           Honorable Freda L. Wolfson

                                                           United States District Judge

34